IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

No. 4:23-CV-213-RJ

STEPHEN JERRITT LEE,

              Plaintiff/Claimant,

v.

MARTIN O'MALLEY,
Commissioner of Social Security,

              Defendant.

O R D E R

This matter is before the court on the parties' briefs filed pursuant to the Supplemental Rules for Social Security Actions. [DE-12, -15]. Claimant Stephen Lee ("Claimant") filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the denial of his application for a period of disability and Disability Insurance Benefits ("DIB"). The time for filing further responsive briefing has expired, and the pending motions are ripe for adjudication. Having carefully reviewed the administrative record and the briefs submitted by the parties, the court orders the case remanded to the Commissioner for further proceedings consistent with this Order.

## I. STATEMENT OF THE CASE

Claimant protectively filed an application for a period of disability and DIB on September 7, 2021, alleging disability beginning August 13, 2021.[1] (R. 17, 253–64). The claim was denied initially and upon reconsideration. (R. 17, 95–121). A hearing before an Administrative Law Judge ("ALJ") was held on August 16, 2023, at which Claimant, represented by counsel, and a vocational expert ("VE") appeared and testified. (R. 37–74). On August 30, 2023, the ALJ issued

[1] Claimant amended the alleged onset date to April 16, 2022 at the hearing. (R. 17, 41).

a decision denying Claimant's request for benefits. (R. 14–36). On November 1, 2023, the Appeals Council denied Claimant's request for review. (R. 1–6). Claimant then filed a complaint in this court seeking review of the now-final administrative decision.

## II. STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996), *superseded by regulation on other grounds*, 20 C.F.R. § 416.927(d)(2)). Rather, in conducting the "substantial evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439–40 (4th Cir. 1997).

## III. DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set forth in 20 C.F.R. § 404.1520 under which the ALJ is to evaluate a claim:

> The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the SSA*, 174 F.3d 473, 475 n.2 (4th Cir. 1999). "If an applicant's claim fails at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995) (citation omitted). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Id.* At the fifth step, the burden shifts to the ALJ to show that other work exists in the national economy which the claimant can perform. *Id.*

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. § 404.1520a(b)–(c). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. *Id.* § 404.1520a(c)(3). The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the "special technique." *Id.* § 404.1520a(e)(3).

## IV. ALJ'S FINDINGS

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found Claimant had not engaged in substantial gainful employment since the alleged onset date. (R. 19). Next, the ALJ determined Claimant had

3

the severe impairments of bilateral knee degenerative joint disease, migraines, tinnitus, obesity, social anxiety disorder, generalized anxiety disorder, and depressive disorder. *Id.* Claimant's cannabis use disorder and hidradenitis suppurativa were deemed non-severe. (R. 19–20). At step three, the ALJ concluded Claimant's impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 20–22). Applying the technique prescribed by the regulations, the ALJ found that Claimant's mental impairments have resulted in moderate limitations in adapting or managing oneself; understanding, remembering, or applying information; interacting with others; and concentrating, persisting, or maintaining pace. (R. 21–22).

Prior to proceeding to step four, the ALJ assessed Claimant's RFC, finding Claimant had the ability to perform light work[2] with the following additional limitations:

> Occasionally climbing ladders, but never climb ropes or scaffolds. He can frequently climb ramps or stairs. Occasionally crouch or crawl. Avoid concentrated exposure to loud noise levels as those are defined in the Selected Characteristics of Occupations due to a history of migraines and tinnitus. He has the ability to understand, remember and carry out instructions for simple routine tasks without a specific production rate requirement, such as assembly line work. He is able to maintain concentration persistence and pace for 2-hour segments for completion of simple routine task, assuming normal 15 minutes morning and afternoon break and 30-minute lunch break. He can interact frequently with supervisors and occasionally with coworkers and have incidental with the public. He has the ability to adapt to workplace changes involving simple work related decisions.

(R. 22–29). In making this assessment, the ALJ found Claimant's statements about the intensity, persistence and limiting effects of his symptoms not entirely consistent with the medical evidence

---

[2] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If an individual can perform light work, he or she can also perform sedentary work, unless there are additional limiting factors such as the loss of fine dexterity or the inability to sit for long periods of time. 20 C.F.R. § 404.1567(b).

4

and other evidence in the record. (R. 24). At step four, the ALJ concluded Claimant could not perform any of his past relevant work as a track vehicle mechanic and food deliverer. (R. 29). However, at step five, upon considering Claimant's age, education, work experience, and RFC, the ALJ determined there are other jobs that exist in significant numbers in the national economy that Claimant can perform. (R. 29–30).

## V. DISCUSSION

Claimant contends that the ALJ erred by failing to account for the total limiting effects of Claimant's severe mental impairments in the RFC, namely by improperly rejecting the medical opinions of Twanna T. Hill, MSN, and Rachel Maynard, MSW-LCAS, as well as the State agency consultants' administrative findings at the initial level and on reconsideration; and failing to adequately consider Claimant's subjective statements about his symptoms. Pl.'s Br. [DE-12] at 3–21. The Commissioner counters that substantial evidence supports the ALJ's finding that Claimant has the RFC to perform a reduced range of light work. Def.'s Br. [DE-15] at 5–23.

"[T]he residual functional capacity 'assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions' listed in the regulations." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting S.S.R. 96-8p). The ALJ must provide "a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* (quoting S.S.R. 96-8p). "Only after such a function-by-function analysis may an ALJ express RFC 'in terms of the exertional levels of work.'" *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (quoting *Mascio*, 780 F.3d at 636); *see also Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (observing that the ALJ "must build an accurate and logical bridge from the evidence to his conclusion").

5

### A. Claimant's Subjective Statements

Federal regulation 20 C.F.R. § 404.1529(a) provides the authoritative standard for the evaluation of subjective complaints of pain and symptomology, whereby "the determination of whether a person is disabled by pain or other symptoms is a two-step process." *Craig*, 76 F.3d at 593–94. First, the ALJ must objectively determine whether the claimant has medically documented impairments that could cause his or her alleged symptoms. S.S.R. 16-3p, 2016 WL 1119029, at *3 (Mar. 16, 2016); *Hines v. Barnhart*, 453 F.3d 559, 564 (4th Cir. 2006). If the ALJ makes that determination, he must then evaluate "the intensity and persistence of the claimant's pain[,] and the extent to which it affects her ability to work," *Craig*, 76 F.3d at 595, and whether the claimant's statements are supported by the objective medical record. S.S.R. 16-3p, 2016 WL 1119029, at *4; *Hines*, 453 F.3d at 564–65.

Objective medical evidence may not capture the full extent of a claimant's symptoms, so where the objective medical evidence and subjective complaints are at odds, the ALJ should consider all factors concerning the "intensity, persistence and limiting effects" of the claimant's symptoms. S.S.R. 16-3p, 2016 WL 1119029, at *7; 20 C.F.R. § 404.1529(c)(3) (showing a complete list of factors). The ALJ may not discredit a claimant solely because his or her subjective complaints are not supported by objective medical evidence, *Craig*, 76 F.3d at 595–96, but neither is the ALJ required to accept the claimant's statements at face value; rather, the ALJ must "evaluate whether the statements are consistent with objective medical evidence and the other evidence." S.S.R. 16-3p, 2016 WL 1119029, at *6; *see Ladda v. Berryhill*, 749 F. App'x 166, 171 (4th Cir. 2018) ("The ALJ cannot 'reject a claimant's statements about the intensity and persistence of . . . pain or other symptoms' or about the effect of those symptoms on a claimant's ability to work 'solely because the available objective medical evidence does not substantiate them.'") (quoting

6

20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2)); *Taylor v. Astrue*, No. 5:10-CV-263-FL, 2011 WL 1599679, at *4–8 (E.D.N.C. Mar. 23, 2011), *adopted by* 2011 WL 1599667 (E.D.N.C. Apr. 26, 2011).

The Fourth Circuit has repeatedly held that "[o]bjective evidence is not required" at the second step of the analysis assessing the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work. *Oakes v. Kijakazi*, 70 F.4th 207, 215 (4th Cir. 2023) (citing *Arakas*, 983 F. 3d 83, 95 (4th Cir. 2020)). Therefore, "[b]ecause a claimant is entitled to 'rely exclusively on subjective evidence to prove that [his] symptoms [are] so continuous and/or severe that they prevented [him] from working,' an ALJ applies the incorrect legal standard in discrediting complaints 'based on [a] lack of objective evidence corroborating them.'" *Id.* (citing Arakas, 983 F. 3d at 96).

Here, Claimant argues that the ALJ rejected his statements concerning the intensity, persistence, and limiting effects of his symptoms "because, in her view, it was inconsistent with the medical evidence and his daily activities." Pl.'s Br. [DE-12] at 19–21. Claimant emphasizes that "[r]ather than offering clear explanations regarding specific limitations, the ALJ [] relied on global references to large exhibits and generalities that essentially ignore evidence demonstrating significant limitations, in particular related to Plaintiff's ability to interact with others." *Id.* at 19. The Commissioner contends that the ALJ properly summarized the objective evidence and Claimant's course of treatment and did not improperly suggest or require that Claimant's alleged limitations be validated by objective support. Def.'s Br. [DE-15] at 6–9. Without reweighing the evidence, the court agrees that the ALJ erred in evaluating Claimant's subjective statements, particularly by cherrypicking the record in order to reject them.

The evidence pertaining to Claimant's mental health impairments is undeniably mixed.

7

Medical records and therapy notes dated prior to the alleged onset date depict a years-long attempt to control Claimant's symptoms with medication, therapy, and other treatment measures, with varied (and temporary) levels of success. (R. 413, 419, 432, 450, 458, 466, 473, 479, 484–85, 490–91, 497, 504–05, 510–11, 517–18, 525–27, 538–39, 544, 549, 555, 562, 564–65, 567, 569, 571, 573, 575, 577, 579–81, 607). Claimant's function report, which is likewise dated prior to the alleged onset date, provides helpful context regarding Claimant's daily activities, typical anxiety triggers, and overall ability to function. (R. 324–31). In the report, Claimant explains that he has a fear of people and being in any situation that is not easily dealt with, cannot speak to authority figures and avoids them "at all costs," and does not leave his house unless he absolutely has to; goes outside approximately five times per month; chooses to engage in hobbies that do not require interactions with others; tends to socialize with friends via text message rather than in person; typically cannot go into public places alone without having a panic attack, and sometimes will have a panic attack even when someone else is present; "make[s] it a point to not socialize with neighbors or friends," as he does not trust people; does not handle even slight changes in his routine; gets stressed thinking about a single phone call to the point that he shuts down and forgets basic information; and has quit several jobs "due to not getting along with employees/bosses because I always felt like everyone hated when I was there." *Id.*

The statements made in Claimant's function report were largely corroborated at the administrative hearing, where Claimant testified that he was let go from his last job for failing to check IDs at the tow lot where he was hired to work as a tow lot attendant; he recently had an interaction with a neighbor that was "traumatic" for him, despite the fact that it was a relatively normal conversation; he worries a lot about what others think of him, but also worries about being a victim of random acts of violence to the point that he feels like "every time [he] leave[s] the

8

house, someone's going to try and kill [him]"; he recently attempted to drive another vehicle off the road when the driver cut him off and he "[took] it really personal, . . . like they did it on purpose to try to harm [him]"; he recently was driven off the road by a U-Haul, which felt "very personal"; he recently cut short a visit to the gas station because, while pumping gas, another car pulled up behind him, and he had "overwhelming intrusive thoughts and agonizing about what to do" to the point that he left without getting gas and now gets gas at 2:30 a.m. with "a gun waiting"; and he currently will not go to the grocery store by himself due to anxiety. (R. 37–51).

At the hearing, Claimant also testified that his mental health medications, which helped some for a brief period of time, no longer work as well; he avoids drive-throughs because they make him feel like a burden to the workers; after several months of seeing his therapist, he "kind of started telling her what she wanted to hear [i.e., that his anxiety was improving] because then [he] wouldn't get anxious that they would drop [him] because [he] wasn't making any progress"; the night before the hearing, he hid in his home with a gun when he thought a DoorDash driver was attempting to break into his house, despite his wife's assurances that no threat existed; he took five Xanax pills before the hearing so that he would not "have a panic attack here in front of everybody," which happened at his consultative evaluation with Twanna Hill; he has been on "just about everything under the sun" prescription-wise and tried marijuana and ketamine therapy, but still needs to take Xanax in order to leave the house, and the Xanax makes him extremely drowsy; he has previously relied on marijuana to be able to make it to medical appointments, with mixed success; he can generally only handle attending appointments over the phone, not in person or over video, but otherwise typically refuses to talk to people on the phone; he previously had a bad experience with ketamine treatment and ultimately stopped using it for anxiety because it got too expensive and caused mood changes once the infusion wore off; he recently became "angry and

9

irate" when a group of teenagers allegedly pushed a hotel door open after he walked past, to the point that he "completely panicked thinking they were trying to rob [him], and [he] grabbed a gun and [] pointed it at them" and threatened to kill them all; and he "always" keeps a firearm at his side because he expects at "any second for somebody to come and rob [him] or try to kill [him]." (R. 51–63). According to Claimant, while he enjoys therapy and has received good information from his therapists, the second he leaves the office, everything he learned "goes out the window." (R. 66).

The ALJ determined that while Claimant's impairments could reasonably be expected to cause his alleged symptoms, Claimant's statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with the medical and other evidence. (R. 24). Specifically, the ALJ noted:

> [T]he claimant has primarily alleged disability related to his anxiety. However, the medical evidence of record does not support the level of impairment alleged. The [claimant] does appear to have a significant level of anxiety when driving and being in large crowds, but the record consistently shows that the claimant was able to drive, at least as far as somewhere in Tennessee and back, as well as going shopping and going out to eat with friends. He has also attended numerous social events (e.g. Exhibits B7F, B18F, B20F). Greater limitations in mental functioning are not supported by the record.

(R. 26–27). This purported explanation blatantly mischaracterizes the record. As previously mentioned, Claimant's medical records and treatment notes from prior to the alleged onset date document waxing and waning symptomology. (R. 413, 419, 432, 450, 458, 466, 473, 479, 484–85, 490–91, 497, 504–05, 510–11, 517–18, 525–27, 538–39, 544, 549, 555, 562, 564–65, 567, 569, 571, 573, 575, 577, 579–81, 607). The ALJ globally references these records but omits this needed context, and likewise fails to address the fact that the record evidence dated after the alleged onset date also shows that Claimant's mental health impairments cause him to have good days and bad

10

days. (R. 26–27, 615, 631–1097); *see, e.g.*, (R. 631) ("Client reports that he has been doing well the past two weeks. Client reports that he went to Walmart on Christmas Eve and had a brief panic attack."); (R. 633) ("Client reports that he is doing well today . . . . Client reports that he has been feeling anxious, but has been "snapping on people" out of anger."); (R. 976) (June 16, 2023 email from Claimant to medical provider: "I was not having a good time. Crying randomly at night for no reason at all and I just felt like everyone was against me. I'm better though, at least for now."). This is error, as the Fourth Circuit has recognized that even impairments that are episodic in nature can be disabling, *see Testamark v. Berryhill*, 736 F. App'x 395, 398–99 (4th Cir. 2018) (citing *Garrison v. Colvin*, 759 F.3d 995, 1017–18 (9th Cir. 2014) (discussing appropriate consideration of intermittent symptom remission during course of sustained impairment)).

Equally relevant, the ALJ plainly did not consider Claimant's subjective statements indicating that even on his good days, Claimant is still limited by his anxiety. First, the ALJ acknowledged that Claimant's treatment records show that he has a "significant level of anxiety when driving and being in large crowds," (R. 26), but completely ignored treatment records indicating that Claimant has a significant level of anxiety when interacting with the public *in general*. *See, e.g.*, (R. 635) ("Client reports that he has avoided a specific drive-thru establishment for 7-8 months due to the anxiety he experiences while ordering . . . . Client reports that he has been avoiding going to a hardware store to get supplies he needs for a household project as he is fearful he may have to interact with others."); (R. 698) ("Client states that he does continue to feel anxious when having to interact with others, specifically his neighbors."); (R. 865) ("Client states that while he was in the hotel, a group of teenagers 'pushed his door in' while he was trying to close it, which resulted in him getting angry, yelling at the teenagers, and contacting law enforcement."); (R. 886) ("States he did have a panic attack a few weeks ago due to going out to

11

eat with his wife and mom. States he often 'avoids' seeing his new neighbor because he doesn't want to have to talk to him."); (R. 894) ("States he has not hung with a 'single friend' of his own since he got out of the army in 2018. States his only friends at this time are his wife's friends."); (R. 916) ("Client disclosed to clinician in a recent session that he often has paranoid thoughts that someone is going to try to harm or kill him in public and attributes this to why he avoids leaving his house. Clinician would like to further assess symptoms to confirm or rule out possible diagnosis of paranoid personality disorder."); (R. 974) (July 7, 2023 email from Claimant to medical provider explaining he is having "way too much anxiety" to go to his July 20 appointment).

Second, the ALJ continued cherrypicking the record by noting that the evidence "consistently shows that the claimant was able to drive, at least as far as somewhere in Tennessee and back, as well as going shopping and out to eat with friends," but omitting critical details and context surrounding these activities. (R. 26–27). With respect to Claimant's driving abilities, treatment notes show overall improvement in this area but also indicate that the exceptions are significant, and that Claimant still only infrequently leaves his house, i.e., he does not drive often. *See, e.g.*, (R. 906) ("Client described this incident, stating that an individual pulled in front of him and 'cut him off.' Client reports that this made him angry, so he sped up to be in front of this vehicle, swerved in front of them, and slammed on brakes with attempts to get this individual to pull off to the side of the road."); (R. 910) ("Client states that he felt increasingly anxious realizing he was going to have to drive through Greenville, which is what he was trying to avoid. Client states that he was noticeably anxious and his wife asked what was wrong with him, which made him begin to panic and eventually [he] switched with his wife and she drove."); (R. 980) (In email to medical provider, Claimant explains, "I am completely housebound 90% of the time"); (R. 998) (In email to medical provider, Claimant explains, "[W]hen I was taking Xanax before I'd only use

12

it when I'd leave the house which is like maybe twice a week?"); (R. 1001) (In email to medical provider, Claimant explains, "I feel like I'm going crazy here all day in the house everyday.").

Similarly, the ALJ's description of the "numerous social events" Claimant has attended overstates their frequency, as well as Claimant's level of comfort in those situations. *See, e.g.*, (R. 635) ("Client reports that he was able to go to the grocery store this week without having much anxiety. Client states that this is significant progress as he used to avoid going to the grocery store at all due to intense anxiety."); (R. 637) (Claimant reports to his therapist that he attended "a number of social events over the last couple of weeks," then proceeds to describe two birthday parties where he experienced some anxiety, a trip to Walmart, and a trip to the gas station where "there were too many people out, so [he] went home."); (R. 639) ("Client states that he was able to attend two social events [over a two week period] and states that it went well."). At bottom, the ALJ seemingly ignores subjective statements Claimant has consistently made to his medical providers, without explaining why, which indicate that he typically does not leave his house *at all* due to anxiety. (R. 324–31, 980, 998, 1001). The court's review is frustrated by the omission, because while it may be a significant improvement for Claimant to be able to leave his house twice in two weeks, it is far from clear that Claimant is therefore able to sustain full-time employment and leave his house for a minimum of eight hours each day.

The ALJ's failure to fully consider the above-described evidence constitutes impermissible cherrypicking, and remand is appropriate on this basis alone. *See Lewis v. Berryhill*, 858 F.3d 858, 869 (4th Cir. 2017) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding.") (quoting *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)); *Lockerby v. Saul*, No. 1:19-CV-00159-MOC, 2020 WL 506752, at *3 (W.D.N.C. Jan. 30, 2020)

13

("An accurate and logical bridge must consider both favorable and unfavorable evidence"); *Montgomery v. Kijakazi*, No. CV 0:21-3074-JD-PJG, 2022 WL 17853557, at *6 (D.S.C. Oct. 26, 2022) ("[S]elective summary of Plaintiff's allegations and of the medical records, followed by a cursory conclusion that her allegations are not fully consistent with the medical records is simply insufficient to satisfy the ALJ's duties and permit meaningful review of the decision."), *report and recommendation adopted sub nom. Wanda M. v. Kijakazi*, 2022 WL 17852614 (D.S.C. Dec. 22, 2022); *Shelley C. v. Comm'r of the SSA*, 61 F.4th 341, 362–64 (4th Cir. 2023). However, the court finds that the ALJ not only cherrypicked the record to improperly disregard Claimant's subjective statements, but also used cherrypicked evidence to discredit the medical opinions rendered by Rachel Maynard, Twanna Hill, and the State agency consultants.

### B. The Medical Opinion Evidence

When assessing a claimant's RFC, the ALJ must consider the opinion evidence. 20 C.F.R. § 404.1545(a)(3). The applicable regulation provides that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a). Instead, the ALJ must consider the persuasiveness of medical opinions using five factors: (1) supportability, meaning that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions or prior administrative medical finding(s) will be"; (2) consistency, meaning that the more consistent an opinion is with other evidence in the record, the more persuasive the medical opinion will be; (3) the medical source's relationship with the claimant, which considers the length of the treating relationship, frequency of examinations, purpose of the treating relationship, extent of the treatment relationship, and

14

whether the medical source examined the claimant; (4) specialization, meaning that "a medical source who has received advanced education and training to become a specialist may be more persuasive"; and (5) "other factors that tend to support or contradict a medical opinion." *Id.* § 404.1520c(c)(1)–(5). The most important factors are supportability and consistency. *Id.* § 404.1520c(a).

### 1. Rachel Maynard, MSW's Opinion

In December of 2021, Claimant began attending mental health counselling sessions with Rachel Maynard, MSW at Hakuna Wellness Center. (R. 24, 659). Over multiple years of treatment, Ms. Maynard completed three assessments of Claimant's mental health-related limitations. (R. 27–28, 659–68, 1096–97). On October 12, 2022, Ms. Maynard opined that Claimant is likely to be off task for 25% of the workday, is likely to miss four days of work per month on average due to his severe anxiety and is incapable of even "low stress" work. (R. 659–61). Shortly thereafter, on October 26, 2022, Ms. Maynard rendered a largely identical opinion, noting the following:

> With the proper medication regimen, vocational rehabilitation, and continued participation in psychotherapy, Mr. Lee would likely be able to work in a low stress job with minimal interaction with others. However, without these interventions, Mr. Lee will likely continue having difficulties working.

(R. 662–68). Ms. Maynard also stated that Claimant's impairments are likely to produce "good days" and "bad days," and recommended that Claimant not participate in high-stress work where he would be required to work with other people or deliver any sort of bad news. (R. 666–67).

Finally, on August 8, 2023, Ms. Maynard opined that while Claimant is capable of satisfactorily understanding, remembering, and carrying out very short and simple instructions and maintaining attention for two hour segments, performing at a consistent pace without an unreasonable amount of rest periods, and taking appropriate precautions for normal hazards, he is

15

"seriously limited" when it comes to sustaining an ordinary routine without special supervision; is

"unable to meet competitive standards" with regards to maintaining regular attendance and being

punctual within customary, usually strict tolerances, making simple work-related decisions, and

getting along with co-workers or peers without unduly distracting them or exhibiting behavioral

extremes; and has "no useful ability to function" with respect to working in coordination with or

proximity to others without being unduly distracted, completing a normal workday and workweek

without interruptions from psychologically based symptoms, asking simple questions or

requesting assistance, accepting instructions and responding appropriately to criticism from

supervisors, responding appropriately to changes in a routine work setting, and dealing with

normal work stress. (R. 1096). Relevant here, Ms. Maynard also noted,

> Mr. Lee makes an active effort to avoid interacting with people, specifically
> those of which he has no relationship or familiarity with. Mr. Lee will avoid
> traveling in unfamiliar places unless there is a significant amount of time
> spent planning his route. Mr. Lee will demonstrate socially inappropriate
> behavior as evidenced by avoidance of interacting with others and minimal
> nonverbal communication when he does interact with others.

(R. 1097). Additionally, Ms. Maynard maintained that, on average, Claimant is likely to miss four

days of work per month due to his impairments. *Id.*

In evaluating Ms. Maynard's opinions, the ALJ noted that while Ms. Maynard has a treating

relationship with Claimant as his therapist, she is a licensed social worker, which is not an

appropriate medical source under the current regulations. (R. 28). The ALJ ultimately found the

opinions unpersuasive, stating that they are "not consistent with [Ms. Maynard's own treatment

records], which consistently note normal mental status exams and reports by the claimant that he

was able to attend numerous social events," and unsupported by the treatment records, which "do

not document any objective observations of impairment in attention or memory." *Id.*

16

The ALJ was correct in stating that Ms. Maynard, as an MSW-LCAS, is not an acceptable medical source. *See* 20 C.F.R. § 404.1502(a) (listing acceptable medical sources as licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, qualified speech-language pathologists, licensed audiologists, and licensed advanced practice registered nurses and physician assistants for impairments within their scope of practice). Under the applicable regulations, ALJs "are not required to articulate how [they] considered evidence from nonmedical sources using the requirements in paragraphs (a)–(c) of [20 C.F.R. § 404.1520c]." 20 C.F.R. § 404.1520c(d). However, the ALJ's explanation for discrediting Ms. Maynard's opinions is troubling because it points to larger issues present in the RFC analysis, i.e., the cherrypicking referenced *supra*. § V.A. This is especially problematic because Ms. Maynard has consistently opined that Claimant's mental health-related symptoms wax and wane and he is likely to miss approximately four days of work per month and be off task for 25% of the workday, (R. 659–68, 1096–97), and at the administrative hearing, the VE testified that being absent from work two or more times per month would preclude competitive employment, (R. 71). *See Shelley C.*, 61 F.4th at 368. Accordingly, on remand, when the ALJ considers the facts of this case in light of the fully developed record, she should also reconsider Ms. Maynard's opinion with that added context.

### 2. Twanna Hill, MSN's Opinion

On April 16, 2022, Claimant met with Twanna Hill, MSN, for a consultative psychiatric evaluation. (R. 27, 593–605). Ms. Hill noted that Claimant came to the examination with his wife, who drove him there; Claimant was punctual, with normal movement, gait, personal appearance, dress, and hygiene; and that during the evaluation, his attitude and cooperation were "cooperative." (R. 593). Claimant also relayed his mental health history, attempts at treatment, and the impact of his symptoms on his daily life and ability to work, specifically explaining that he is unable to

17

function because,

> I'm so anxious and depressed, going around people makes me drained[.] [My] arms and body feel like a noodle, like my body is weak when I am anxious; especially in social settings. I feel others are watching me or that I will make a mistake and be viewed negatively, worried what others are thinking; intrusive thoughts fill my mind. Sometimes I run back inside to avoid the judgement of people.

(R. 594–97) (cleaned up). Claimant explained that while is able to complete his activities of daily living on his own and can socialize with his family and online friends relatively well, he "[h]asn't seen other friends since he got out of the Army; [he] cancel[s] all the time on them and neighbors [he] avoid[s]." (R. 597). Additionally, Ms. Hill noted that while Claimant was friendly and communicable during the appointment, he appeared tense and anxious, and at one point during the evaluation "developed a choking sensation in [the] throat and watery eyes and [a] red face; [w]ater and cool air helped, but he remained unable to speak for a short period of time." (R. 597–98).

As part of the evaluation process, Ms. Hill completed several cognition exercises with Claimant. (R. 599–602). Based on those assessments and the clinical interview, Ms. Hill ultimately opined that Claimant has difficulty following directions, especially multi-faceted instructions or multiple tasks; difficulty sustaining attention to perform simple repetitive tasks; difficulty relating to others, including coworkers and supervisors, because he is "easily intimidated and sensitive to criticism and anxious—too bossy or irritable people bother[] him [and he quits] frequently from jobs"; and is likely "unable" to tolerate the stress associated with work activity because of his "unstable mental health conditions" and needed medication management. (R. 603–04). The ALJ found Ms. Hill's partially persuasive, noting the following:

> [Ms. Hill's opinion] was based on a single exam only. In addition, it is vague, assessing the claimant would have "difficulty" without providing a substantive definition of that term. In addition, some of the limitations expressed appear to be based solely on the claimant's subjective complaints.

18

(R. 27).

Claimant's argument concerning Ms. Hill's opinion is difficult to decipher, but given the ALJ's blatant cherrypicking of the record, the court agrees that remand is warranted on this basis. Supportability and consistency are the "most important" factors of the medical opinion persuasiveness inquiry, and the ALJ must discuss how they considered these factors in the written opinion. §§ 404.1520c(b)(2), 416.920c(b)(2). The ALJ may explain their consideration of the other factors but is only required to do so when contrary medical opinions are equally persuasive in terms of both supportability and consistency. §§ 404.1520c(b)(3), 416.920c(b)(3). In that situation, the ALJ must then articulate the remaining factors and their application to the persuasiveness of the medical opinion. *Id.*

As previously detailed, in the instant case, the record shows that Claimant's anxiety symptoms are episodic and not nearly as well-controlled as the ALJ's improper, cursory review of the evidence implies. *See supra* § V.A. The existing errors suggest that the ALJ did not consider whether Ms. Hill's opinion would be consistent with *all* of the evidence and supported by *all* of the treatment notes when viewed in light of the disabling symptoms that Claimant has actually alleged, i.e., that while he is able to perform his activities of daily living inside his house, the moment he steps outside its four walls or interacts with members of the public that he does not know, he is unable to function normally. As a result, it is difficult for the court to evaluate the ALJ's persuasiveness analysis. On remand, the ALJ should assess the persuasiveness of Ms. Hill's opinion in the context of a more fully developed record.

### 3. The State Agency Consultants' Opinions

At the initial level, State agency psychological consultant David R. Mullen, PhD assessed Claimant's mental capacity, finding that Claimant is capable of understanding and retaining at least

19

simple instructions; can carry out very short and simple instructions and is able to maintain attention and concentration for two hours at a time; can accept instructions and tolerate coworkers and supervisors in a non-public setting in which interactions are brief, superficial and task-oriented, and tolerate no contact with the general public; and can adapt to changes in simple, routine, and repetitive tasks in relatively stable work settings that are also relatively undemanding. (R. 95–100, 103–05). State agency consultant Jennifer Fulmer, PhD, made substantially identical findings on reconsideration and affirmed that Claimant has moderate mental health-related limitations. (R. 117–18). Addressing these opinions, the ALJ stated the following:

> Both of the State agency psychological consultants concluded that the claimant had moderate impairment in understanding, remembering and applying information; interacting with others; maintaining concentration, persistence or pace; and adapting or managing oneself (Exhibits B2A, B4A). These opinions are largely consistent with the medical evidence of record as a whole, but are based on document review rather than clinical assessment of the claimant or an established treatment relationship. They are partially persuasive.

(R. 27). As with Claimant's argument pertaining to Twanna Hill, the precise contours of Claimant's argument concerning the State agency consultants' opinions is difficult to decipher, but the court finds that remand is appropriate for the same reasons articulated above. *See supra* § V.B.2. Namely, the ALJ mischaracterized and cherrypicked the record to reject Claimant's subjective statements about his symptoms and assess the supportability and consistency of the State agency consultants' opinions. *Id.* These errors frustrate meaningful review, *see Testamark*, 736 F. App'x at 398–99; *Lewis*, 858 F.3d 858 at 869, and remand is appropriate for further consideration.

## VI. CONCLUSION

For the reasons stated above, the case is REMANDED, pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings consistent with this order.

SO ORDERED, this the _14_ day of November 2024.

20

Robert B. Jones, Jr.
United States Magistrate Judge

21